FABIO KRISHNA PERIERA
175 WEST 137 STREET, #304
NEW YORK, NY 10030
Tel. +1 424 253 5231
fabio@alumni.bates.edu

THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA,

ALEXANDRIA DIVISION

| | |
|---|---|
| FABIO KRISHNA PERIERA, PRO SE,    ) <br>    ) <br>             Plaintiff,   ) <br>    ) <br> vs.    ) <br>    ) <br>    ) <br> CREATIVE ARTISTS AGENCY,    ) <br>    ) <br> INTERNATIONAL CREATIVE MANAGEMENT, <br> UNITED TALENT AGENCY, <br> RICHARD LOVETT, PRESIDENT, CAA <br> ASHLEY HASZ, CHRIS LAWSON <br><br>             Defendants | Case No.: 1:16cv1220 LMB/JFA <br><br> Petition for relief from violations of: <br><br> 13th Amendment; <br><br> 42 U.S.C. 1983; <br><br> 42 U.S.C. 1985(3); <br><br> 18 U.S.C. 373, 1030, 1029, 1117, 1362, 1831, 1832, 2511(1), and 2701; <br><br> Commonwealth of Virginia Civil Code § 18.2-22; <br><br> Commonwealth of Virginia Civil Code § 18.2-152.2; <br><br> Commonwealth of Virginia Civil Code § 18.2-152.4; <br><br> Commonwealth of Virginia Civil Code § 18.2-186.3; <br><br> Commonwealth of Virginia Civil Code § 18.2-386.2; <br><br> Intentional Infliction of Emotional Distress, 280 Va. 670 (1989). |

F I L E D
SEP 2 3 2016
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

### Question Presented

Does a private entity, not operating as an agent of the State, have the right to continue surveillance of a private person, who may be operating as an agent of the State under color of law, after a business relationship has

1  been ended and the now harassing private entity has been formally requested

2  to cease surveillance-based interference?

3      **Facts**

4      The Plaintiff, Fabio Krishna Periera, was until October 3, 2016, a

5  resident of the State of New York who during the time period this case

6  concerns had business in Washington, DC metropolitan area. He is now living

7  in the United Kingdom and studying for an LLM in International Economic Law,

8  Justice and Development. His current physical address is 175 West 137 Street

9  #304, New York, NY 10030.

10     The principal Defendant, Creative Artists Agency, a Delaware

11 corporation, is headquartered at 2000 Avenue of the Stars, Los Angeles, CA

12 90067. International Creative Management, an employment agency, is

13 headquartered at 10250 Constellation Boulevard, Los Angeles, CA 90067. United

14 Talent Agency, an employment agency, is headquartered at 9336 Civic Center

15 Drive, Beverly Hills, CA 90210. William Morris Endeavor, an employment

16 agency, is headquartered at 9601 Wilshire Boulevard, Beverly Hills, CA

17 901210.

18     The Plaintiff acknowledges that due to the centrality of 1983 statute

19 violations via the Computer Fraud and Abuse Act and the character of the

20 Defendant's statements, it is difficult to ascertain whether Richard Lovett,

21 CAA's President and CAA employees acted alone or in coordination with the

22 other named defendants.

23

24     Cause of Action: 15 U.S. Code § 1, 3, 6, & 6a; Commonwealth of Virginia

25 Civil Code § 18.2-22

26     As industry practices vary between entertainment and international

27 affairs, the matter before the court is best framed within the context that

28 *Craigslist v. 3taps* [942 F.Supp.2d (N.D. Cal. 2013)] provides, a case in

which the Plaintiff sought to block the Defendant's aggregation of data and was requested to cease and desist. Craigslist, after trying to use an IP address blocker (to stop 3taps' computers from accessing their website) eventually was forced to seek judicial relief where 3taps was found guilty of violating the Computer Fraud and Abuse Act.

Three entertainment industry-specific terms are relevant here: the first is 'hip-pocketing,' when an employment agency decides to informally represent a client's entertainment career in the hope of the client succeeding independent of any real assistance; the employment agency would then seek to make the relationship official. The second is 'back-pocketing,' when an employment agency falsely represents their intention to a given informal client in the hope that, through their own actions, the client's career will be crushed.

Another term is relevant here: agenting. A subset of employees in the Defendant's business are called 'talent agents,' a sales profession that encourages its young employees to do things like open other people's mail. Thus, the term 'agenting' takes on an intentional implicature which helps to explain why, for instance, the California Department of Labor's registry of talent agents does not display the names of many of the industry's well-known 'talent agents.' Larger employment agencies like the Defendant employ vast numbers of individuals who, though they perform the functions of a California labor code professional classification, do not appear on the registry of talent agents.

A review of industry-specific literature (*The Mailroom* by David Rensin, *Ovitz* by Robert Slater and, *Power to Burn* by Stephen Singular) makes clear that agenting is a practice that has evolved with the times. As a Delaware corporation that also possesses a large marketing agency, the Defendants talent agents would not only have established relationships with nearly every

3

1    corner of the entertainment industry but would also have access to large
2    stores of marketing data used by global marketing firms to fine tune their
3    communications in different socioeconomic groups. Thus, the use of data
4    obtained from for-profit third party data aggregators in the operation of its
5    talent agent line item and the manipulation of that data to serve the
6    interests of talent agent clients, including those hip-pocketed and back-
7    pocketed. *Bollea v. Gawker* drives home the point: a talent agent and several
8    other media executives conspired to cause economic damage and emotional
9    distress to that Plaintiff. Gawker Media benefitted from the agenting wrought
10   on Mr. Bollea, actions that amounted to 'back-pocketing clients,' which that
11   case, which is currently being appealed, finds to be an illegal practice
12   [*Bollea v. Gawker Media et al.,* Sixth Circuit Court of Florida, Case No:
13   1201447-CI-011].

14

15        On June 11, 2010, the Plaintiff began a business relationship with
16   Creative Artists Agency, (CAA) the principal Defendant, an employment agency
17   based in Los Angeles, California that offers a variety of services to
18   creative professionals, primarily in the motion picture arts industry. Ashley
19   Hasz, who initially introduced herself to the Plaintiff as an 'independent
20   producer' advised the Plaintiff on matters related to his screenwriting and
21   acting career, his relationship to Chris Lawson, an executive of the
22   principal Defendant, and made overtures of friendship that codified the
23   foundation of the overall conspiracy. To wit, after admitting that she
24   'hated' being at the principal Defendant's headquarters, which confirmed the
25   Plaintiff's suspicion that Ms. Hasz was in fact a CAA employee, she proposed
26   work assignments that would have been obvious to anyone the Plaintiff was not
27   able to complete simply because of a lack of funds and/or the proper
28   equipment. This would set up a pattern of the Defendant continually proposing

4

work assignments that never materialized at the expense of real opportunities while at the same time draining the Plaintiff of financial resources and cutting off access to his friends, professional associates and even his attorney.

Although initially informal, the relationship was eventually codified in a 'Submission Release Agreement,' contract that authorized the Defendant to read a screenplay produced by the Plaintiff for the purposes of deciding whether it might be sold for production or financed independently on or about May 18, 2012. The contract, standard in the industry, also gave both parties a shared first right to any profits derived from any sale and production of the script with an expiration date of 45 days. As per the reading agreement, the Defendant was not under any obligation to further represent the Plaintiff though a subsequent phone call with Mr. Lawson, an employment of the principal Defendant, revealed that though the Defendant did not have any interest in selling the Plaintiff's script, the Defendant did wish to continue working with the Plaintiff on an informal basis, an agreement that, by definition relieves the Plaintiff of any obligation to the Defendant(s) based on the 'reserve clause' often invoked by entertainment and professional sports companies against performer-clients. This is the case, first, because in the entertainment industry, the rules established by the Screen Actors Guild, of which the Plaintiff is a former dues paying member, only allow informal arrangements, sometimes called 'handshake deals,' a term of up to seven years before automatic expiration. Further, as per Screen Actors Guild rules, a party like the Plaintiff simply needs to notify a party like the Defendant that they wish to formally terminate the relationship for any and all contractual obligations between the two to cease. Indeed, the 'seven-year rule' for the termination of contracts is so standard in entertainment that not only does it feature in a sham of a lawsuit between the principal

Defendant and United Talent Agency (UTA). One party in that lawsuit is Greg Cavic, an employment agent whose career was boosted by the Plaintiff's personal selection of him for an article in *The Hollywood Reporter*'s 2009 Next Generation issue, which has an industry reputation for naming the future leaders of the entertainment business. At the time, Mr. Cavic was an employee of CAA and is now, as a result of his defection, an employee of UTA. In that case, the seven-year termination rule mentioned by the Plaintiff as SAG actor is used as the basis for justifying the transfer of staff between two members of what this case shows to be little more than a petty employment agency cartel. [*Creative Artists Agency v. United Talent Agency, Gregory Cavic, & Gregory McKnight*. No. 123994. Cal Super. Ct.]. Further, to the extent that the Plaintiff was required to give notice to the principal Defendant of his exit from their business relationship, he did, as is discussed later in this complaint, the Plaintiff did.

 Causes of Action: Commonwealth of Virginia Civil Code § 18.2-22; Commonwealth of Virginia Civil Code § 18.2-152.2 Commonwealth of Virginia Civil Code § 18.2-152.4; 18 U.S.C. 1030, 1029, 1362, 2511(1), and 2701.

 This has not stopped the Defendant from conspiring to steal intellectual property created by the Plaintiff by regularly and repeatedly trespassing onto the Plaintiff's computer system(s) with the further intent to cause the Plaintiff's death. As established by case law, the Defendant is criminally liable for these actions. [*United States v. Agosto-Vega*, 617 F.3d 541, 552-53 (1st Cir. 2010); *United States v. Singh*, 518 F.3d 236, 249-51 (4th Cir. 2008); *United States v. Hughes Aircraft Co.*, 20 F.3d 974, 978-80 (9th Cir. 1994).] While Creative Artists Agency (CAA) is primarily responsible for these actions, the Plaintiff argues that the remaining named Defendants are indeed co-conspirators who, with knowledge of CAA's actions,

stood by in the expectation that the death of the Plaintiff would result in intellectual property from which they could expect to profit. This further supports the Plaintiff's claim that the Defendant(s) are guilty of violating the Sherman Act.

The Defendant's trespass of the Plaintiff's computer systems resulted in costly and irreparable harm. As a result of the principal Defendant's repeated, intentional, and unauthorized accessing of the Plaintiff's computer and interference with the Plaintiff's 'possessory interest in the computer system,' between September 2014 and April 2016, a number of service visits were required on an eventually defunct MacBook Pro with a direct material effect on the Plaintiff's grades at Columbia University--for a graduate program the Plaintiff took out approximately $36,000 in federal loans to participate in but, due to the constant harassment of the Defendant(s), was unable to complete. During August 2016, the Plaintiff suffered lost income due to the principal Defendant rendering a later laptop, a Lenovo IdeaPad 100S, temporarily completely useless.

The vast majority of the interference the Defendant is responsible for directly impacted the Plaintiff's ability to create and maintain an income outside of the entertainment industry – in any industry, and especially after he began a career in international affairs. Within the entertainment industry, industry-specific literature shows that employment agencies of the Defendants' ilk have normalized interference in any and all employment affairs of their clients. This creates a monopoly on a given client's employment circumstance, which the Plaintiff argues is a fundamental civil rights violation, especially for someone like the Plaintiff, who had exited the entertainment industry, began a career and education in another industry and been explicitly clear that he had no desire to return to the entertainment industry.

For someone who in part makes his career as a writer, a monopoly on employment is a fundamental civil rights violation, especially when employment agencies like the Defendant are not actively finding work for their clients while blocking their attempts at career development. Further, the fact that to allow the behavior of the Defendant would also create a monopoly over the Plaintiff's data - that is, anything and everything he had ever written, whether or not the Defendant had represented his interests in good faith or sought to pilfer his copyrighted work by backpocketing his career - creates fundamental questions about whether the structure of the entertainment industry creates monopolies that were meant to be expressly prohibited by the Sherman Act. Freeriding, with the expectation that a client the Defendant disliked would still produce valuable data and/or intellectual property that could be monetized after a given client's death relates to the findings of the Ninth Circuit Court of Appeals in *PeopleBrowsr v. Twitter* [No. CGC-12-526393 (Cal. Super. Ct. Nov. 27, 2012)], and somewhat in *Craigslist v. 3taps,* creates indentured servitude, if not slavery; freeriding for creative content creators, blocked from or harassed out of other means of procuring an income, would ultimately doom them to either serfdom via state assistance or death, and foreclose the possibility of greater income generation that indentured servitude implies. At its heart, backpocketing in the entertainment industry does not suggest that the clients who find themselves in that unfortunate situation lack market value; quite the opposite, it suggests that though they have value, companies like the Defendant have decided to act in bad faith with the hopes of monetizing their creative works without them downstream. Further, backpocketing raises the prospect that people unrelated or only tangentially related to the entertainment industry might finds themselves the victim of the Defendant's industry that feels itself to be as or like the Central Intelligence Agency

8

but without the National Security Act of 1947 to justify actions that otherwise might be considered illegal. It is worth mentioning that even the National Security Act does not allow the CIA to get away with whatever it pleases; just as the Federal Bureau of Investigation is able to bring CIA officers who have violated the Constitution and the United States Code to justice, so too should talent agencies who seek to profit from violations of the law be subject to the civil and criminal penalties imposed by law – from violations of the Computer Fraud and Abuse Act, the Sherman Act, the Civil Rights Act, the Espionage Act and other legislation designed to protect the public interest. Further, 'claims that refusals to deal [by backpocketing a client] protect 'incentives of companies to innovate and compete, or reduce 'free-riding on [the monopolist's] substantial investment of time, effort, and expense' presuppose the sufficiency of business justifications that anti-trust law has yet to accept.' [124 *Yale L.J.* 867 2014-2015 at 875.]

   *Bollea*, too, implicitly relies on the illegal access of data and the desire of some to create an illicit economy through its access and distribution. Recall that in *Bollea*, it was necessary for the Court to seize <u>all</u> of Gawker's data for review so that its culpability in a conspiracy designed by an employee of an employment agency, employed by a subsidiary of one of this action's named Defendants, United Talent Agency, and executed by that agent along with executives of a radio show. The express purpose of both the illegal access of Bollea's data and the conspiracy that begat his data was to cause economic and emotional harm to Bollea through 'revenge porn,' defined by the Virginia Code as the 'malicious dissemination' of stolen private pornographic material featuring Bollea. It is also notable that Bollea is now pursuing criminal charges against Gawker Media as is his right under the rule of lenity.

A number of factors caused the relationship between the Plaintiff and Defendant to lapse, chief among them the Plaintiff's expressed desire to build a career outside of the entertainment industry. In September 2014, the Plaintiff took material steps toward that goal by enrolling in the Executive Master of Public Administration program at Columbia University in the City of New York. By November of 2014, the Plaintiff was actively involved in a job search that would eventually, through a personal contact of the Plaintiff who bore no affiliation to the Defendant, led to a Short Term Consulting contract with the International Bank for Reconstruction and Development, commonly known as either 'The World Bank Group' or the 'World Bank' in Washington, DC. During this time, neither the Plaintiff nor the Defendant made attempts to contact each other for any purpose.

Like the termination of many largely informal relationships between employment agencies and their clients, the Plaintiff assumed that the lapse in communication in the relationship with the Defendant of over three years, as well as the Plaintiff's publicly stated desire to begin a new career, would suffice in ending the contractual relationship, in part because the Plaintiff had long suspected that the Defendant was solely interested in back-pocketing his career. After a long period of investigation, the Plaintiff came to believe beyond a reasonable doubt that this was in fact the case and terminated the relationship formally by sending a certified letter to that effect, citing the applicable labor laws of the States of New York and California, where the relationship had been most active, which was received on July 18, 2016 and signed for by Indra Modula who is employed at the Defendant's New York office. Because the principal Defendant regularly claims to be other companies like UTA, and has even claimed to be the CIA itself, a similar letter of terminating any formal relationship between the Plaintiff and UTA was sent during August 2016. Further, the Plaintiff also

filed a complaint with the United States Equal Employment Opportunity
Commission (EEOC Charge No. 520-2016-02492) which, though it dismissed on the
grounds that evidence of *employment* discrimination could not be found, 'this
does not certify that Respondent is in compliance with the statutes. No
finding is made to any other issue that might be construed as having been
raised by this charge,' which includes the issues of harassment, the
Defendant's incitement to violence and threats to public security raised by
this pleading.

   The Defendant, as will be made clear later, has not ceased interference
in the Plaintiff's affairs and insists against all logic that the life story-
based script that constituted the basis for the reading agreement between the
two parties constitutes a 'lifetime contract that [the Defendant] just made
up' because the Plaintiff is 'a black man' who 'studied rhetoric,' is
'legally three-fifths a person' and therefore does not have the right to sue.
Further, the Defendant claims to this day that the only way for the Plaintiff
to exit a 'lifetime contract' is through suicide. This comes despite the
Defendant's employee, Mr. Lawson, having stated in an email to the Plaintiff,
dated, June 26, 2012, that the Plaintiff was a 'non-client.'


   The Plaintiff's contract with the World Bank began on March 23, 2015
under Terms of Reference that included primary responsibility for developing
the communications strategy for the Managing Risks for Sustainable
Development and Increased Shared Prosperity Global Solutions Group, a new
global cross-sectional department reporting directly to the Independent
Evaluations Group of the World Bank Group's Board of Directors. The Managing
Risks Global Solutions Group was to help report on global systemic risks like
climate change, financial inclusion, gender equality and other topics that
can and often do lead to violent global conflict. The Plaintiff was

particularly suited to lead the global communications strategy for this department as his undergraduate academic work documenting US-Iranian diplomacy and continued commentary on international affairs had earned him not only a sterling academic reputation amongst his peers, but had also been the reason Columbia University waived admissions requirements for the Graduate Record Examination for his matriculation. It is important to note that while the Plaintiff's direct supervisors were assigned to cover the Latin American and Caribbean region, the Plaintiff was assigned to cover the Middle East and North Africa region so he could participate in international, diplomatic, and technical discussions related to the Joint Comprehensive Plan of Action (JCPOA) as well as trends and globally coordinated work in Fragile and Conflicted States like Iraq and Syria that would be immediately affected by the implementation of the JCPOA. In his time at the World Bank, the Plaintiff was the primary editor of a comprehensive joint report of the World Bank and the United Nations High Commission on Refugees concerning the Syrian Civil War's global refugee crisis. The Plaintiff's direct supervisors were, at no point, party to these discussions.

Cause of Action: 42 U.S.C. 1983; 42 U.S.C. 1985(3); 18 U.S.C. 373, 1030, 1029, 1117, 1362, 1831, 1832, 2511(1), and 2701; Commonwealth of Virginia Civil Code § 18.2-186.3; Commonwealth of Virginia Civil Code § 18.2-386.2

It was primarily through violations of 18 U.S.C. 2511(1), 2701, 1029, and 1362 began that 42 U.S.C. 1983 was also violated. In an incident that that foreshadowed the Defendant's strategy, on or about the second week of the Plaintiff's employment with the World Bank, the Plaintiff's personal computer – which, like many World Bank consultants, he used periodically for business purposes – was illegally accessed by the Defendant and made to display pornographic material at full volume. This was the start of a string

of incidents in which the Defendant knowingly and illegally violated the

Plaintiff's personal and/or business computers and cellular phone with the

intention of not only destroying his career in international affairs, but

also with the stated intent to cause the Plaintiff to commit suicide.

A great deal of the Defendant's violations of 18 U.S.C. stemmed from

the use of location-based unauthorized computer and cell phone access,

primarily through his cellular phone, an iPhone 5c that had been secured for

use by the World Bank Group [*Facebook, Inc. v Power Ventures, Inc.*, 844

F.Supp.2d 1025 (E.D. Cal. 2012)]. Nearly every time the Plaintiff used a taxi

cab, the Defendant would illegally access the Plaintiff's phone. On some

occasions, the Defendant's access would result in the taxi driver being

rerouted from the Plaintiff's stated destination. On others, the Defendant

illegally accessed the car's speakers and would indicate to anyone within

earshot that some catastrophe was about to befall them—for instance, that

passersby should run because an armed person was approaching with the

intention to harm them. Pedestrians would then run, fleeing imaginary

bullets. Given that this transpired in Washington, DC, the Plaintiff would

hold that the Defendant was, in effect, shouting 'Fire' in a crowded theatre

(*Schenck vs. United States*).

Demonstrating the further applicability of *Schenck*, in a particularly

heinous incident at the intersection of Broadway and 58th Street on July 20,

2016, the Defendant was responsible for the breach of New York Police

Department radio equipment in which the Defendant tried to encourage the NYPD

to use lethal force against the Plaintiff in lieu of him being sent by

ambulance to Mount Sinai Roosevelt Emergency Department. At the time, the

Defendant kept trying to encourage to everyone present that they were all

participants on a kind of reality television set, and that they had specific

replies as per a kind of scripted drama. The Defendant was repeatedly heard

13

saying 'Your next line is' before every juncture at which someone might object to what was unfolding. The Defendant was also heard saying, 'I'm going on television and you'll be dead!'

Schenck vs. United States also holds several other parallels to the present case. First, the Defendant has made clear that the intended result of their actions would end in multiple crimes, chief amongst them intellectual property theft and if not the encouragement to suicide, then certainly murder by a third party. Second, the Defendant has likely violated the Espionage Act of 1917 by conspiring to punish a former World Bank consultant, who is by definition a representative of the United States Government under the Bretton Woods Agreement and the Articles of Agreement respecting the International Bank for Reconstruction and Development, for having done his job in supporting the foreign policy of the United States—especially if the Defendant and its employees were operating as agents of a foreign state, which on several documented occasions they claimed to be. Finally, Schenck required that the judiciary provide relief so to alleviate the 'clear and present danger to bring about evils which Congress has a right to prevent' posed by the Defendant. While the Plaintiff recognizes that it is the State's function to render punishment under the Espionage Act of 1917, the Plaintiff raises this issue now to highlight the seriousness of the Defendant's actions and underscore the need for judicial relief. Further, 'the rule of lenity applies here because conduct in a civil case under the relevant provision of CFAA would also be a criminal violation [United States v Nosal, 676 F.3d 854 (9th Cir. 2012)]. It bears mentioning that in international affairs the kind of behavior exhibited by the Defendants would be a matter of national counterintelligence that would engender a defensive reply, perhaps not in a civilian court of law, by the FBI at least, and quite possibly by the CIA, Department of State, and Department of Defense, amongst others. Because the

14

Plaintiff was a consultant to the World Bank, he reported the security threats posed by the Defendant(s) to World Bank Corporate Security. For Americans working at the World Bank, that requires a direct report be made to the Department of State and the Diplomatic Security Service.

Cause of Action: Violation of the 13th Amendment; 42 U.S.C. 1983; 42 U.S.C. 1985(3)

Violations of the 13th Amendment and 42 U.S.C. 1983 comprise the great majority of the Plaintiff's complaint against the Defendant. *Cort v. Ash* [422 U.S. 66 (1975)] established a four-part test for determining whether a plaintiff could sue under 42 U.S.C. 1983. In essence, plaintiffs must prove that Congress intended for there to be a private remedy to a private problem for members of the class for which the Act of Congress provides for, so long as the right to sue is consistent with the statute's purpose and the issue to hand is a federal, and not state, matter.

In the case before the Court today, the Plaintiff alleges that the Defendant violated his right to privacy through violations of the Computer Fraud and Abuse Act and by making deliberately false representations to employers and educators the Plaintiff had or sought to build relationships with so as to cause harm to the Plaintiff.

The Defendant's actions also included spreading rumors about the Plaintiff to the effect that he is a child molester, a registered sex offender, and a terrorist. The location-based harassment suffered by the Plaintiff extends to the Defendant routinely hacking speakers in the vicinity of the Plaintiff, across New York City and even while the Plaintiff was visiting his alma mater as an alumni speaker at Bates College in Lewiston, Maine. None of these statements are true; all of them are damaging to the Plaintiff's reputation as an international affairs consultant, respected

15

enough on matters of national and international security to be followed on Twitter by Canada's Joint Delegation to NATO as recently as September 13, 2016.

The Defendant has also violated U.S.C. 1985(3), which the United States Supreme Court has narrowly construed to apply to cases involving private parties who discriminate against minority groups by seeking to either restrict their travel or force them into involuntary servitude. The Plaintiff holds that the Defendant is guilty of both. The first example of this stems from the Plaintiff's time at the World Bank when the Plaintiff was required to travel to Clermont-Ferrand, France to participate in a conference co-sponsored by the Governments of France and the United Kingdom. The Defendant was originally scheduled to depart for France on June 1, 2015 at 3:25 PM from Washington Dulles International Airport. Due to the Defendant's interference, largely in the form of illegal computer access, the Plaintiff was not only detained by the Washington, DC Metropolitan Police Department but employees of the Defendant visited the precinct where the Plaintiff was being held and held discussions with the officers on duty. At that time, the Defendants stated that it was their intention to steal a work of creative fiction the Plaintiff was working on in his spare time. Needless to say, the Plaintiff was quickly released from custody but missed his flight to France and had to be rebooked, at taxpayer expense, on another flight the following day.

On August 20, 2016, as the Plaintiff prepared to travel to Lewiston, Maine to give a speech about his career in international affairs to incoming students at his alma mater, Bates College, the principal Defendant repeatedly harassed the Plaintiff through illegal access to his cellular phone, claiming that the trip had been cancelled, that the Plaintiff was no longer wanted as a presenter, that the Plaintiff was a wanted terrorist on the No Fly List who

should stay home, and that should the Plaintiff board his flight, which he did, that the plane would be shot down or explode.

The Defendant has also sought to interfere with the Plaintiff's matriculation to law school at Birkbeck, University of London. The Defendant's recent statements against the Plaintiff all fall within the Supreme Court's interpretation of 1985(3) in that they seek to place unconstitutional limits on the Plaintiff's travel, stating almost daily that the Plaintiff either has 'to move back to California or kill [him]self.' Other recent statements include phrases like: 'You're not going back to California because you're only three-fifths a person,' a reference that makes clear the racial intent behind the Defendant's unconstitutional actions and holds parallel to the Supreme Court's decision in Griffin vs. Breckenridge which established the use of 1985(3) for claims related to travel.

Insofar as the Defendant is in violation of 1985(3)'s coverage of involuntary servitude, the Defendant's daily illegal accessing of the Plaintiff's cellular phone allows the Defendant to claim that while some of the creative works the Plaintiff submitted to the Defendant at one time are of high quality, the Defendant 'does not want [the Plaintiff] to profit from them—which is why you have to kill yourself.' Considering that the Plaintiff entered into reading agreement with the Defendant at one time in good faith, the Plaintiff would hold that the Defendant's insistence that works of creative value should only net the Defendant a profit constitutes a form of involuntary servitude. That is, by stating almost daily that the Plaintiff 'needs to get writing' on creative works that the Defendant is actively trying to prohibit the Plaintiff from profiting from, the Plaintiff is essentially trying to engage in a racialized form of involuntary servitude cum murder.

1    This involuntary servitude has a sexual component. A significant amount
2    of time has been spent harassing the Plaintiff, a gay man, whenever he
3    attempts to build a constructive, romantic relationship. At the same time,
4    the Plaintiff's use of location-based romantic dating apps consistently
5    redirected the Plaintiff to sexual encounters with people like the
6    aforementioned associate of the Defendant who stated 'We are going to enjoy
7    killing you.' Further, when the Plaintiff made it clear that he not only was
8    going to exit the entertainment industry and begin study at Columbia
9    University, the Plaintiff was recommended to 'pursue both' a career in
10   international affairs and in pornography and/or sex work in repeated contact
11   with the Defendants and their associates.

12   The Defendant's use of illegal means to access the Plaintiff's cellular
13   phone and computer has resulted in significant property damage. The
14   Plaintiff's MacBook Pro was hacked to the point of hard drive failure not
15   once, but twice—the second time while the Plaintiff was preparing a journal
16   article for publication in the Columbia University *Journal of International*
17   *Affairs* concerning the Islamic State. The Defendant's actions had a chilling
18   effect on the Plaintiff's career development: professionals like the
19   Plaintiff depend on journal articles in esteemed, peer reviewed journals like
20   the *Journal of International Affairs* to not only contribute to the common
21   defense of American liberty but also to advance their academic and
22   professional careers. Further, one paid journal article begets another; as
23   this was the Plaintiff's first journal article, the fact that the Defendant
24   went to extraordinary lengths to make sure it did not get published had a
25   material effect on the Plaintiff's ability to procure a stable income.

26   This fit with an established pattern of behavior in which the Defendant
27   sought to undermine the Plaintiff's education at Columbia University. This
28   included finding ways to prevent the Plaintiff from taking advantage of the

ability to cross-register for courses at other Columbia University graduate schools, as the Defendant did when the Plaintiff, then a part-time employee of Columbia Law School who had received approval to take Law and Development from the course's professor, found his cross-registration denied. The Plaintiff was the only part-time student in the Executive MPA program to have his cross-registration at Columbia Law School denied. Having long suspected that the Defendant had lied to Columbia University administrators about representing the Plaintiff, the Plaintiff was not surprised that a confrontation with one of the deans of the School of International and Public Affairs yielded a reply confirming that, in fact, University administrators had allowed the Defendant to interfere with the Plaintiff's education, thereby violating his civil rights.

As of September 2016, not only has the primary person responsible for blocking the Plaintiff's right to an education been removed from the School of International and Public Affairs, so too have officials bribed by the Defendant at the World Bank with book deals in exchange for blocking the continued employment of the Plaintiff.

Cause of Action: Intentional Infliction Emotional Distress, 280 Va. 670 (1989).

It is important to remember that while the Commonwealth of Virginia places tight limits on torts for the intentional infliction of emotional distress, the bulk of the emotional distress the principal Defendant placed on the Plaintiff occurred while the Plaintiff was working for the World Bank in a position that had a material effect on global and national security. Thus, the Defendant's conduct is both intentional and reckless on a scale hard to fathom outside of a terrorist act.

Further, the continued daily harassment of the Plaintiff by the Defendant, which grows more and more violent each day, is outrageous and

1   intolerable. The following is a list of the Defendant's statements documented

2   by the Plaintiff on August 14, 2016 at 6:00 AM.

3       'This is about white supremacy.'

4       'He's writing everything down. He still hasn't learned his lesson from

5   Stephen Galloway.'

6       Stephen Galloway is the Plaintiff's former manager from *The Hollywood*

7   *Reporter* who objected to the Plaintiff documenting workplaces abuses by

8   senior managers which formed the basis of a wrongful termination suit

9   [*Periera v. The Hollywood Reporter*, Los Angeles, California Superior Court

10   Case BC459054] that was settled in mediation.

11       Further Statements on August 14, 2016 following those above include:

12       'What if we use some sound effects and scramble our voices?'

13       'You may not want to be president, but your Dad does, which means you

14   do, and [unintelligible]… you believe everything we say.'

15       'This is about preventing another black president.'

16       'Semper Fi! Swear loyalty to Creative Artists [Agency]!'

17       'Oh my God, we're just trying to have fun with you. Speaking of which,

18   why don't you just kill yourself?'

19       'This is what you get because you don't know when to commit suicide,

20   Fabio.'

21       'You studied rhetoric, Fabio. I know, come on, it's funny. That's what

22   we're killing you with.'

23       'You still haven't learned your lesson from Stephen Galloway, which is

24   that you're still writing things down.'

25       On a nearly daily basis, the Defendant's executives illegally access

26   the Plaintiff's cellular phone and computer to ask sardonically, 'Why did you

27   have to go and make such a big deal out of yourself,' followed by statements

28   that confirm their displeasure at 'having clients more powerful' than they

are, a direct reference to the Plaintiff's former position at the World Bank.
Further references are made to 'taking away' the Plaintiff's account at the
Bank-Fund Staff Federal Credit Union 'because he doesn't deserve it' and
numerous statements have been made on multiple occasions that the Defendant
has illegally accessed World Bank and Bank-Fund Staff Federal Credit Union
servers to thwart the regular operation of the Plaintiff's credit union
account.

On a similarly routine basis, the Defendant asks the Plaintiff to
'swear [his] loyalty] to Creative Artists,' and shouts 'Semper Fi! Long live
Creative Artists.' The daily verbal attacks, all through illegally accessed
computers and cell phones, include pointed references to putting the
Plaintiff's family through the same treatment with the same desired outcome:
suicide. 'You're no good, your whole family has to go,' is a frequent
statement endured by the Plaintiff.

On a separate occasion, a representative and/or associate of the
Defendant told the Plaintiff point blank, 'We are going to enjoy killing you'
and 'This is for what you did to Israel,' implying that the Plaintiff's work
in supporting the foreign policy of the United States was somehow deserving
of 'punishment' for 'not bowing to Israeli supremacy' and 'not swearing an
oath of loyalty to Israel.' The Defendant has repeatedly claimed that its
behavior constitutes a 'price-tag attack.' In doing so, the Defendant has
claimed, in various locations and at various times, that it is the CIA, the
FBI, NYPD and various other companies and institutions. Claims of being the
CIA or representing itself as the Director of Central Intelligence has
stopped as of September 9, 2016 when the phrase 'CAA's DCI' began replacing
the earlier claim.

Given that the Defendant admits their objective is to kill the
Plaintiff, even if that method is by 'forcing' the Plaintiff to commit

suicide, the Plaintiff believes that, at a minimum, the State's interest in preventing the suicide of its citizens, further supported by the fact that every state in the Union makes it a felony to encourage someone to commit suicide, proves the Defendant's intent to inflict emotional distress, if not actual harm.

These, however, are not the worst statements repeatedly made by the Defendant. At regular intervals, employees of the Defendant have used illegal cellular phone and computer access to spread rumors that the Plaintiff constitutes a threat to the State. On September 2, 2016, the Defendant stated that rather than cease their actions, the solution would be found through the institution of 'a new federal government.'

Further, the Defendant is clearly motivated by an intent to cause emotional distress over its executive's displeasure with the JCPOA and the Plaintiff's limited involvement in its implementation as part of the World Bank's Managing Risks Global Solutions Group. The thinking behind the Defendant's statements goes like this: The Plaintiff did work related to Iran, and Iran is bent on the destruction of the United States and Israel, ergo the Plaintiff is an Iranian agent bent on the destruction of the United States and Israel. The logical fallacy in this false syllogism is obvious, considering the support of the Israel Defense Force's support of the JCPOA, the Joint Comprehensive Plan of Action having established greater diplomatic ties between the US and Iran, that matters between the United States and Iran have been adjudicated by the US-Iran Claims Tribunal since April 19, 1981, that the First Amendment protects the Plaintiff's right to research and publish on matters of diplomacy - especially when doing so was part of his job at the World Bank.

Due to the malicious actions of the Defendant, the extension of the Plaintiff's contract, valued at approximately $45,750 per 150 days or $79,605

22

per working year, with the World Bank was terminated early. The Defendant's actions also included bribing World Bank officials to induce them not to hire the Plaintiff in other departments. In addition to the chilling effect the Defendant's interference with the publication of a national security-related journal article at Columbia University, the Plaintiff's early termination from his role at the World Bank had the effect of making him persona non grata to many major employers who otherwise might have been happy to have him. Further, the Plaintiff was subject to anti-corruption clauses that constituted part of his World Bank contract and prevented him from taking employment with other firms in similar fields that he ordinarily would have been inclined to work for.

Further, having been in large part for the Defendant's withdrawal from Columbia University, for which the Plaintiff is almost $36,000 in debt, the Plaintiff expects to suffer future income losses that he would have had without the Defendant's interference, namely those derived from graduating from an Ivy League university into a career with the World Bank that would have averaged somewhere in the vicinity of $150,000 per year.

This case, however, is not solely about employment; were that the case, it would have been filed in state courts under applicable laws. This case is about the Defendant's aggravated racist behavior and actions against the Plaintiff for no other reason than the Plaintiff's desire to fulfill his obligations by supporting the stated foreign policy of the United States of America. This case rests on the presumption that knowingly intervening, by way of the Computer Fraud and Abuse Act, in the work of someone who could be characterized under color of law as an agent of the State, by someone who is not, for no other purpose than to harass him/her to commit suicide is a fundamental violation of what the Supreme Court has held in both the 1983 and 1985(3) statutes, at bare minimum. Further, even as a private party not

characterized as an agent of state, the Defendant's actions are illegal under current federal law, especially as the Plaintiff has made every effort to respectfully terminate the relationship by formal means.

In the present case, the Plaintiff, though he has reason to suspect the Defendant's motives based on its pattern of self-attributed hostile statements, has nonetheless paid the Defendant the courtesy of following the more formal requirements of California law regarding the termination of employment agencies it terms 'talent agencies,' by sending a certified letter to that effect to the New York offices of CAA. Nonetheless, the Defendant's illegal attacks on the Plaintiff have continued and have been extended to threaten the lives of his immediate family.

**Remedies Sought**

In Bollea v. Gawker Media, a parallel case in many ways, the Court found for the Plaintiff in the amount of $140.1 million. Given that the case before the Court involves matters of national security with market values in excess of $200 billion, the Plaintiff asks the Court to use the judgment in this case as an award benchmark.

The Plaintiff, Fabio Krishna Periera, seeks a judgment against the Defendant, Creative Artists Agency and Does 1 through 10, where Does 1 through 10 may be inclusive of executives from International Creative Management, United Talent Agency, and William Morris Endeavor, as well as smaller, unnamed talent agencies, as follows:

1. For an award of general and special damages in an amount in excess of the minimal jurisdictional limits of this court in accordance with proof at trial together with interest thereon at the maximum legal rate;

2. For costs of suit incurred herein;

24

3. For an Order and Judgment transferring to Plaintiff all of the Defendant's right, title and interest in and to all data obtained by the Defendant(s) concerning the Defendant inclusive of any and all video and audio recordings, written works of any form, computer data, and any and all computer programs created for the purpose of extracting data from the Plaintiff and/or any electronic devices in his possession;

4. For an Order and Judgment requiring the Defendant to deliver to the Plaintiff all copies of data requested, in all formats and forms of media including electronic and physical media, within the Defendant(s)' possession, custody or control, including without limitation turning over to the Plaintiff any and all storage devices (such as CDs, DVDs, hard drives, computers, flash drives, tapes, and discs) containing the same;

5. For preliminary and permanent injunction against the Defendants and all persons acting under their control, from any and all activity that would cause the distribution, dissemination, publishing, display, posting, or linking for view or access on or through the Internet or any other media outlet, broadcasting, transferring, licensing, selling, offering to sell or license, or otherwise using, exploiting or attempting to exploit, data concerning the Plaintiff.

6. For an Order and Judgment to turn over to Plaintiff all information pertaining to data obtained by the Defendant, for any purpose, especially those criminal in nature, including without limitation, all activity by all persons and entities related to the creation, storage, transport, editing, distribution, dissemination, posting, or linking for view or access on or through the Internet or any other media outlet, broadcasting, transferring, licensing, selling, offering to sell or license, or otherwise using, exploiting or attempting to exploit, data concerning the Plaintiff;

7. For a constructive trust to be placed upon the Defendant(s) and all persons acting on their behalf or under their direction or control, as to all revenues and profits received by any and all such individuals, including the Defendant(s), to be held for the benefit of the Plaintiff, and to be disgorged in their entirety to Plaintiff, in connection with data gathered by the Defendant;

8. For any other and further relief that the Court may deem necessary and proper.

**Demand for Jury Trial**

The Plaintiff Fabio Krishna Periera hereby demands a trial by jury on all triable issues.

Dated this [day] of [Month], [year]

_____
FABIO KRISHNA PERIERA

26